IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 6, 2013 Session

## IN RE ERYKAH C.[1]

**Appeal from the Chancery Court for Hamilton County**
**No. 11A048      W. Frank Brown, III, Chancellor**

_____

**No. E2012-02278-COA-R3-PT-FILED-MAY 6, 2013**

_____

This case involves an appeal by a mother of the termination of her parental rights to her daughter. We conclude that the grounds for termination have been established by clear and convincing evidence. Further, there is clear and convincing evidence in the record that termination of the mother's parental rights is in the child's best interest. Accordingly, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Peter J. Arant, Chattanooga, Tennessee, for the appellant, Karen M. C.

Michael S. Jennings, Chattanooga, Tennessee, for the appellees, Daniel Scott Harnsberger and Tabitha Rife Harnsberger.

Jeff Davis, Hixon, Tennessee, guardian ad litem.

### OPINION

### I. BACKGROUND

This case is a parental rights action terminating the parental rights of Karen M. C.

---

[1]This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last names of the parties.

("Mother") to her daughter, Eryka C. ("the Child") (d.o.b. August 29, 2010).  Eric T. ("Putative Father"), the apparent biological father of the Child, was named as a defendant in the underlying action.  He never made an appearance or responded to the petition.[2]  Daniel S. H. and Tabitha R. H. are the prospective adoptive parents ("Adoptive Parents").

Mother, who has spent much of her life in and out of group homes and other facilities, has had a court-appointed conservator over her person for her entire adult life.  The current conservator, Diana Crawford Johnson ("the Conservator") joined in Adoptive Parents' underlying adoption petition as a co-petitioner, in order to provide her consent to the adoption.  At a hearing in this matter, the Conservator testified as follows:

> Q.    As the conservator of [Mother's] person, do you see any hope for substantive change?
>
> A.    Sadly, as things go now, no, I don't. . . . [H]aving a child, the stress of having a child would just be so much – just be too much for her.

The Child left Mother's custody shortly after her birth.  According to Mother, while she was living with an aunt in Catoosa County, Georgia, she was arrested when she and the aunt got into an argument.  While she was incarcerated, Mother agreed to give temporary custody of the Child to the aunt.  The Conservator subsequently gained temporary emergency custody of the Child and maintained her for two months.  Thereafter, through connections at the Conservator's church, the Child ultimately came into the custody of Adoptive Parents.  In July 2011, Mother filed a petition in juvenile court seeking the return of the Child.  While Mother was awaiting a hearing on her petition, however, Adoptive Parents filed their petition in November 2011 to terminate Mother's parental rights and to adopt the Child.

The trial court ultimately found that three separate and independent grounds for termination of Mother's parental rights existed:  (1) abandonment by a "willful failure to visit," (2) abandonment by a "willful failure to support," and (3) mental incapacity to parent.  It was also determined that termination of Mother's parental rights to her daughter was in the Child's best interest.  In the trial court's final order of termination, the following remarks, inter alia, are found:

> [Mother] testified she filed a Petition for Custody of Erykah on July 7, 2011.  Trial Exhibit 7.  The second page of Trial Exhibit 7 is a notice of a hearing set

---

[2]A judgment of default was entered against Putative Father on June 11, 2012.  The trial court terminated Putative Father's parental rights in the final order and he is not participating in this appeal.

for January 23, 2012. The notice states that "Failure to appear at the above stated hearing could cause this petition to be dismissed."

[Mother] did not appear at the Hamilton County Juvenile Court on January 23, 2012. She said it was raining hard that day and she did not have an umbrella. [Mother] was pregnant at the time and her second daughter would be born in March thereafter. [Mother] produced no evidence that the case she filed on July 7, 2011, No. 244, 653, had not been dismissed. She certainly did not actively pursue this case.

* * *

[Mother] has had ten residences since 1998. . . .

* * *

[Mother] admitted that she has been diagnosed as having bipolar disorder. However, she is not taking any medication for her disorder as "some meds make you sleep during the day." However, she opined that she does not need medication "unless someone triggers me – brings up my past."

* * *

[Mother] tested in the 90th percentile for issues involving her control, the 96th percentile for her violence scale, and 71% for the stress coping scale. . . .[3]

[Mother] did not file any petition asking the Juvenile Court for an order o[f] visitation with Erykah. There is no evidence of any pending case in the Juvenile Court of Hamilton County.

* * *

Dr. Hillner has seen nothing which would indicate [Mother] can change her situation. She has had extensive hospitalizations since she was 18 and she has not changed. [Mother] does not recognize that she has a problem. She blames someone else for her problems. She will not take medications, for various reasons, to treat her mental illness.

---

[3]Dr. Hillner's report noted that Mother's scaled score on the violence index indicated a severe problem.

[The Conservator], who has known [Mother] from the age of 12, testified that [Mother] historically would get in trouble, announce her changed life, and then show no evidence of change. [The Conservator] said that [Mother] actually thrived in jail because it was a structured environment.

\* \* \*

Mother filed this timely appeal.

## II. ISSUES

Mother raises the following issues:

1. Whether there was clear and convincing evidence to terminate Mother's parental right on the basis of abandonment.

2. Whether there was clear and convincing evidence to terminate Mother's parental rights on the basis of mental incompetence.

3. Whether termination of Mother's parental rights was in the best interest of the Child.

4. Whether the trial court abused its discretion by admitting the report and testimony of the independent expert into evidence despite the expert's viewing of inadmissible records concerning Mother's childhood mental health history.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C. W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), abrogated on other grounds by *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental rights termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug.13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

The Tennessee Supreme Court has provided guidance in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, *the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be

correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010) ]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010) (emphasis added).

## IV. DISCUSSION

## ABANDONMENT

As noted above, the trial court found three grounds for terminating Mother's parental rights. Only one ground must be established by clear and convincing evidence to justify termination of parental rights. Tenn. Code Ann. § 36-1-113(c). The party petitioning for termination carries the burden of proof. *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). The statutory requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Tennessee Code Annotated section 36-1-113 provides the grounds for termination of parental rights. The applicable provisions read as follows:

> **36-1-113. Termination of parental rights.** – (a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

> * * *

> (c) Termination of parental or guardianship rights must be based upon:

>> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

>> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

> * * *

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). . . . :

> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. §§ 36-1-113(a) - (g)(1) (Supp. 2012).[4]  "Abandonment" under the applicable statute means that:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i).  In the case at bar, the trial court determined that the applicable period of time to review under this statute was July 8, 2011 through November 7, 2011.


### FAILURE TO VISIT

Willful failure to visit means "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation."  Tenn. Code Ann. § 36-1-102(1)(E).   The element of willfulness in a termination case is discussed at some length by this court in *In re Audrey S.*:

> In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will.  Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent.  Conduct is "willful" if it is the product of free will rather than coercion.  Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do

---

[4]Recent amendments have not modified provisions applicable in this case.

so, and has no justifiable excuse for not doing so.

*Id.*, 182 S.W.3d at 863-64 (citations omitted). In determining whether a child has been abandoned based upon a failure to visit, there is no requirement of a prior visitation order. As observed by the trial court, in *In re M.L.P*, 281 S.W.3d 387, 392-93 (Tenn. 2009), the Supreme Court noted as follows:

> We decline to hold that a parent must be aware of the consequences of his failure to visit for such a failure to be willful. The plain language of the statute requires that the failure to visit be "willful," not that the parent be fully apprised of every consequence the failure to visit might produce. Persons are presumed to know the law and ***parents should know that they have a responsibility to visit their children.***

*Id.* at 392-93 (citations omitted) (emphasis added).

Mother contends that her efforts to regain custody of the Child have been rebuffed and that she was instructed to raise her issues in a court of law. According to Mother, she has established through the record and testimony that she was attempting to exercise her rights in court during the four-month time period preceding the filing of the termination petition. As noted above, shortly before the four-month period began, she filed a petition in juvenile court seeking the return of the Child and was awaiting a hearing date. The record reveals that on December 2, 2011, after the filing of the termination petition, Mother filed a handwritten motion:

> To whom it may Concern
>
> I [Mother] is (sic) requesting to have a Court Date Set Because I have no inten[t]ions of adopting my Daughter Erykah T. [ ] out. I will do what ever it takes to get my daughter back in my Cust[o]dy ASAP. These people are being vindictive towards me And I don't appreiecate (sic) it. Thank you for your Time and understanding of this Emergency Request.
>
> If you will Please Set Me a Court Date to get my Daughter Erykah T. [ ] Back at home.

Accordingly, she contends that because she was pursuing the matter in court, her parental rights should not be terminated for failure to visit. Her counsel argues that Mother understood that only the court action mattered. Counsel thus posits that Mother lacked the requisite intent to abandon the Child.

Mother cites *In re Adoption of A.M.H.*, 215 S.W.3d 793 (Tenn. 2007) and *In re Chelbie F.*, No. M2006-01889-COA-R3-PT, 2007 WL 1241252 (Tenn. Ct. App. Apr. 27, 2007), for the proposition that the filing of a custody action and turning to the courts for assistance precludes a determination of willful abandonment based upon either a failure to visit or a failure to support one's child. Under the facts in this case, however, the evidence supports the determination of the trial court that Mother "certainly did not actively pursue this case." Indeed, she missed a scheduled court date because it was "raining like really bad." Thus, we do not find the cases cited by Mother to be controlling.

The trial court further concluded that Mother did not even attempt to visit the Child during the applicable four-month period. Despite Mother testifying that (1) she knew Adoptive Parents had custody of the Child and (2) she had their telephone number, she never attempted to arrange a single visit. No evidence was presented that anyone prevented or interfered with Mother visiting the Child. *In re Audrey S.*, 182 S.W.3d at 864. The Tennessee Supreme Court has previously determined that "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009). The trial court additionally found it significant that Mother "did not file any petition asking the Juvenile Court for an order of visitation with [the Child]."

We conclude that the record contains clear and convincing evidence supporting the termination of Mother's parental rights on the ground of abandonment based on willful failure to visit.

## FAILURE TO SUPPORT

As noted by the trial court, the law in this state is clear that a parent has a duty to support a child, regardless of whether there is a prior court order requiring such. We have held:

> We agree with the juvenile court that Mother's history of support of the children was not reasonable and showed willful failure to make reasonable payments toward their support. The proof fully supports a finding that she contributed only token support to her children not only over the four month period preceding the filing of the amended petition, but also over the period the children had been in the custody of the Grandmother. ***Though Mother was not under a court order setting support for her children, such an order is not required.*** The former common law obligation to support is codified at Tenn.

-9-

Code Ann. § 34-1-102(a); as well, ***it is the public policy of Tennessee that parents owe a duty of support to their children.*** *See Berryhill v. Rhodes*, 21 S.W.3d 188, 192 (Tenn. 2000).

*In re M.A.C.*, No. M2007-01981-COA-R3-PT, 2008 WL 2787763 at *5 (Tenn. Ct. App. July 17, 2008) (emphasis added) (footnote omitted). The duty to support one's child also is expressly required by statute as follows:

> Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]

Tenn. Code Ann. § 36-1-102(1)(H). A party seeking termination of parental rights must prove by clear and convincing evidence that the opposing party had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse. *See In re Audrey S.*, 182 S.W.3d at 860, 864.

Mother asserts that she is excused from supporting the Child because (1) she is indigent and (2) her non-custody of the Child prevented her from obtaining governmental assistance for her daughter. The record and Mother's testimony reveals that she receives $698 a month from Social Security and also qualifies for food stamps to pay for her food. In our view, having some funds, together with the ability to communicate with Adoptive Parents, allowed Mother to provide or to at least offer to provide some minimal level of financial assistance for the Child. She testified, however, as follows:

> Q.      Now, when you get that [disability] check you've not given a nickel or a penny to [Adoptive Parents], have you?
>
> A.      No. Because I feel like, you know, I shouldn't have to – because I have felt that they are trying to keep me from my child . . . .

Her actions reveal that she intentionally did not support the Child.

Mother also asserts that because she did not have physical custody of her daughter, she could not draw a government check for the Child. She related as follows:

> I just can't do nothing with her not in my hands right now, because if I had her in my hands today, understand this, if I had her today I could take her to the Social Security office, get her her own check . . . .

In Mother's view, because she could not draw a government check for the Child, she had no responsibility for the upkeep of her daughter. She refused to contribute any amount of her monies – not even a small amount – for the Child's support. The record supports the trial court's determination that Mother abandoned the Child by failing to pay support.

## MENTALLY INCOMPETENT

The underlying petition relies on a third ground for termination – Mother's mental incompetency. This ground is found at Tennessee Code Annotated section 36-1-113(g)(8)(B), as follows:

> The court may terminate the parental or guardianship rights of [a parent or guardian] if it determines on the basis of clear and convincing evidence that:
>
> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition *is presently so impaired and is so likely to remain so* that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and
>
> (ii) That termination of parental or guardian rights is in the best interest of the child.

Tenn. Code Ann. § 36-1-113(g)(8)(B) (emphasis added). Adoptive Parents have the burden to demonstrate by clear and convincing evidence both that Mother is presently unable to care for the Child and that it is unlikely that Mother will be able to do so in the near future. *In re Keishel N. E.*, No. M2012-01108-COA-R3-PT, 2013 WL 440061, at *7 (Tenn. Ct. App. Feb. 4, 2013). Relative to termination based on mental incapacity, the statute expressly states that no finding of willfulness is required to establish this ground. Tenn. Code Ann. § 36-1-113(g)(8)(C).

Mother asserts that while the report depicts her as an individual who has struggled with mental health issues, it does not establish that her difficulties rise to the level required to terminate her parental rights.

To provide clear and convincing evidence regarding Mother's mental incompetence, Adoptive Parents produced the testimony and twenty-page report of Dr. William M. Hillner. Dr. Hillner met with Mother for 7.5 hours in six meetings over a span of two months, and

administered a wide battery of assessment tests on her.[5]  He also reviewed medical records pertaining to Mother's mental health history since her 18th birthday.[6]  Based upon the battery of tests, the review of Mother's adult medical records, the interviews with Mother, and his decades of experience, Dr. Hillner concluded that (1) Mother's current mental functioning was impaired and (2) that he saw little hope of change that would allow Mother to resume the care and responsibility for the Child in the future.  The summary reads as follows:

> Current Functioning: The following summarizes this writer's concerns about her current functioning:
>
> * Her responses to Multiaxial Diagnostic Inventory and other devices indicate a fairly consistent pattern of not acknowledging her problems.  This is considered a serious liability as she would not be able to make necessary changes to achieve a higher level of functioning.  Her responses to questions also were inconsistent and reflected a reluctance to disclose difficulties.  Initially, for example, she denied depression initially but later admitted this.
>
> * The MMPI personality pattern might have a clear bearing on her day-to-day functioning as a parent.  Clients with this pattern often have problems with impulsivity.  They find it difficult to delay gratification.   They tend to feel frustrated with their circumstances and may be resentful of any demands others place on them.  They tend to ignore social standards and values and may act out problems without regard to the consequences.  Their characteristic manipulative behavior is maladaptive and may alienate other people who tend to lose patience with them.
>
> * Based on the current MCMI, [Mother] may have a "core personality" which includes an Avoidant Personality Disorder with Dependent Personality Traits, Paranoid Personality Features and Self-defeating Personality Features.  The major personality features described reflect long-term or chronic traits that are likely to have been evident for several years prior to the present assessment and are likely to continue.

---

[5]Mother did not appear on the initially scheduled date for her mental examination.  She then failed to appear at a subsequently-agreed upon time and place.

[6]Records in the court file show diagnoses of Schizoaffective Disorder, Depressive Type, Bipolar Type; Post traumatic Stress Disorder; Oppositional Defiant Disorder; and an IQ of 63.  Mother was raised by a mother who abused her emotionally and physically and lived with an uncle who molested her.  She was removed from her family at age 11 and placed in foster care.

* Based on the cognitive testing, her overall intelligence falls within the "low average" range. However, she has significant deficits in verbal abilities.

* This writer is also concerned about her difficulty participating in this evaluation. Even though the custody of her child was at stake, she missed appointments, was late and even had to leave early. She also brought her infant daughter with her. While this writer understands [Mother] has limited financial resources, this would suggest she will have difficulty meeting appointments for her children in the future.

* In spite of the seriousness of her psychiatric difficulties, her compliance with medication is very suspect. In 2009 (only three years ago), she admitted she had not been taking medication and told an evaluator she finally realized she "might" need this. When questioned about this during a session with this writer, [Mother] stated she does not want to take the medication as she disliked the impact and believes she no longer needs this. On the very last contact with [Mother], she mentioned a desire to see a psychiatrist but this was not consistent with other comments she made.

* Her typical day does not involve activities designed to stimulate a child's development. Her responses to questions about how she might facilitate a child's social development was very poor, indicating a lack of consideration of this important area.

* "The Gardner Inventory" reflected significant weaknesses, e.g., use of "popping" the child rather than utilizing other forms of consequences, inconsistence and inadvertently reinforcing maladaptive patterns of misbehavior.

* Her lack of stability greatly concerns this writer. It was only in January of this year, [Mother] established her own residence and has remained at this address.

* She stated she has finally terminated her relationship with [Putative Father], the children's father who she described as an alcoholic in June of this year. However, he apparently was present in the waiting room during one of the sessions.

Regarding Dr. Hillner's conclusion that it is unlikely that the Mother's incapacity will

change "in the near future," the report reads in part as follows:

Predictions: Obviously, it is difficult to predict with accuracy what a person will do in the future. Professionals such as this writer must rely on past behavioral patterns to make such predictions. Based on the available data, this writer cannot recommend the return of the child to this mother. There is little to convince this writer [Mother]'s serious emotional and behavioral issues will change.

* This writer is troubled by her denial of problems, even though she has good reason to be sad, anxious or frustrated. Without acknowledging problems, one cannot begin to make positive changes. Due to her denial of problems, it is difficult to offer an accurate diagnosis. For example, although a review of her records referred to hallucinations which were recognized by other mental health professionals, she denied this history and denies current concerns.

* Her pattern of avoiding medications also places her "at risk" for decompensation.

* Her lack of a stable residence creates the potential for placing her children in an unsafe situation.

* This woman has a remarkable number of psychiatric hospitalizations, some short-term and others long term. It is difficult to determine with accuracy her specific psychiatric history as [Mother] was evasive and did not provide specific dates or places and this writer often had to rely on the records obtained. Based on the available information, since turning 18, the following has occurred:

* Several admissions at Middle Tennessee Institute.

* At least four admissions at Moccasin Bend Institute from 2002 to 2004, one lasting two months, one lasting five months, one lasting seven days and one lasting fifteen days.

* Generations Group Home (unspecified duration) and Rosewood Group Home (one admission lasting at least 30 days).

* Outpatient services, crisis team contacts (six) and a Battering Program.

-14-

This would predict the need for future hospitalizations.

* In recent hospitalizations, she has been diagnosed with Schizoaffective Disorder, a serious psychiatric disorder . . . .

Mother provided no witnesses to testify as to her competency.

Based upon Dr. Hillner's comprehensive assessment, written report, and his testimony at trial, the trial court concluded as a matter of law that Adoptive Parents proved by clear and convincing evidence that Mother is (1) presently incompetent to adequately provide for the care and supervision of the Child because of mental impairment, and (2) such mental impairment is so likely to remain that it is unlikely that Mother will be able to resume care or responsibility for the Child in the near future. We find that the evidence meets the high standard required to terminate Mother's parental rights on the basis of mental incapacity.

### INDEPENDENT EXPERT'S REPORT AND TESTIMONY

The trial court, at the request of Adoptive Parents pursuant to Rule 35.01, Tennessee Rules of Civil Procedure, appointed Dr. Hillner as an independent medical examiner to assess Mother's mental condition. Mother's counsel thereafter filed a motion for protective order, requesting limitations on what Dr. Hillner could order and review. The trial court directed that Dr. Hillner's access to Mother's mental health history be restricted to her records as an adult. Due to a clerical error, however, Dr. Hillner did not receive a copy of the protective order and obtained some of Mother's minor records. He submitted a report which referenced some records dated prior to Mother's 18th birthday. Mother's counsel argued that Dr. Hillner was "tainted" or "prejudiced" by his review of some of Mother's earlier medical records and sought to have him excluded as an expert. The trial court entered an order directing Dr. Hillner to issue a new report that would exclude the use of or reference to any of Mother's earlier medical records.

Dr. Hillner's trial testimony was that he had plenty of adult data on Mother to reach his conclusions:

Q.     Dr. Hillner, how many years of data did you have for that amended report, number two, post 18th birthday?

A.     Since she has been 18, so eight, nine years.

Q.     Now in your professional opinion, is that enough data to reach a valid

supportable conclusion?

A.    Yes.

Upon questioning by Mother's counsel, Dr. Hillner related the following:

> [I]n all evaluations I try to look at where that person is right now, or at least for the past few years. Things change during childhood. Things change and evolve. My recommendation is based on testing that I did right now, my observations of her during this – the evaluation process, interviewed her train of thought currently, and all the variety of data that I've already listed. So it was really focused on what she's currently doing.

The trial court questioned Dr. Hillner specifically about whether his conclusions as Mother's present mental condition and likelihood of change in the future was based exclusively on her medical history since age 18 forward. The court apparently found his testimony on this issue to be credible, as the trial court's opinion concludes that "Dr. Hillner, solely on her medical records after [Mother] was 18 years old as well as his interviewing and testing of her, concluded that Erykah should not be returned to [Mother] under Tenn. Code Ann. [section] 36-1-113(g)(8)(B)." We find that the evidence supports the trial court's conclusion that Dr. Hillner's conclusions were not tainted by consideration of any of Mother's juvenile mental health history.

**BEST INTEREST**

Having concluded that there was clear and convincing evidence supporting the statutory grounds to terminate Mother's parental rights, we must consider whether termination of Mother's parental rights was in the best interest of the Child. In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:
>
> > (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2010). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when

the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

Mother contends that the trial testimony does not demonstrate that it would be in the Child's best interest for her parental rights to be terminated. Adoptive Parents submit that the evidence clearly demonstrates that the Child's best interest is best served by the termination of Mother's parental rights.

The trial court made the following conclusions regarding the nine factors:

(1) [Mother] has not taken or made any adjustments regarding her mental illness and economic, housing and transportation issues which would make it in Erykah's best interest to be placed in [Mother]'s home. [Mother] does not believe that she needs any medication for her illness. [Mother] does not have a stable home.

(2) Neither parent has maintained visitation or other contact with Erykah, during the applicable four month period or any other time period.

(3) A meaningful relationship does not exist between either parent or Erykah. Indeed, at this time, it does not appear that either [Mother] nor [Putative Father] has a meaningful relation with each other either.

(4) A change in the child caretakers and physical environment would have a terrible effect on Erykah's emotional and psychological condition. She has been with [Adoptive Parents] for over 18 months. She is only 25 months old. Erykah is stable and her behavior and actions conform to expected social standards.

(5) [Mother] has shown neglect of Erykah by violating the criminal laws, being arrested, and spending time in jail. She has failed to maintain employment and support of Erykah. She has no stable home nor transportation.

(6) [Mother] is unemployed and living from Social Security disability, food stamps and other welfare. It is not known whether [Putative Father] is employed or not.

(7) [Mother] has never had steady employment. Her last employment was in 2008.

(8) Neither parent has paid any child support to [Adoptive Parents] for Erykah.

The termination of the parental rights of [Mother] . . . to Erykah, pursuant to the factors set forth in Tenn. Code Ann. [section] 36-1-113(i)(1-)-(9), is in the child's best interest because:

> (a) Erykah [C.] has bonded with [Adoptive Parents] and their children. [Adoptive Parents] have established a meaningful parent-child relationship with Erykah during the 18 months Erykah has lived with them; neither parent has a meaningful parent-child relationship with Erykah;

> (b) Erykah is part of a eight-person family unit that includes married persons in the father and mother roles and five siblings;

> (c) [Adoptive Parents]' home is safe, secure, stable and healthy and there is no evidence to support any contention to the contrary;

> (d) Erykah has lived with [Adoptive Parents], who have been responsible for her education, medical and dental treatment, clothing, shelter and other necessitities of life since April 21, 2011;

* * *

Neither [Putative Father] nor [Mother] has paid any support at all for Erykah within the applicable four (4) month period or any other period. Instead, [Adoptive Parents] have met all of Erykah's needs through their own funds.

The adoption of Erykah into a two-parent family, one in which Erykah already perceives Daniel S. H. as her father figure and Tabitha R.H. as her mother figure, plus [Adoptive Parents]' five biological children as her siblings, would be in the best interest of Erykah.

Erykah is thriving in a safe, secure, structured, predictable environment where

-19-

her emotional, physical and spiritual needs are being met by [Adoptive Parents];

It is in the best interests of Erykah [C.] that the parental rights of [Putative Father] and [Mother] be terminated in order that the adoption of Erykah [C.] can occur[.]

(Some numbering in original omitted). The factors cited by the trial court clearly establish, by clear and convincing evidence, that termination of Mother's parental rights is in the best interest of the Child. It would not be in the Child's best interest to further delay her integration into a safe and stable environment in the hope that Mother will be able to successfully undertake her parental responsibilities.

## V. CONCLUSION

We affirm the order of the trial court terminating Mother's parental rights. This case is remanded for further proceedings as may be necessary. Costs are assessed against the appellant, Karen M. C.

_____
JOHN W. McCLARTY, JUDGE